**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 11 CR 030 |
| | ) | |
| REFUGIO MATA FRANCO. | ) | Judge Robert M. Dow, Jr. |
| | ) | |

**MEMORANDUM OPINION AND ORDER**

On December 9, 2010, the Government filed an information charging Defendant Refugio Mata Franco ("Mata Franco") with unlawful reentry under 8 U.S.C. § 1326(a)(2). Before the Court is Mata Franco's motion to dismiss [15] the information. Mata Franco contends that because more than five years have passed since the Immigration and Customs Enforcement ("ICE") division of the U.S. Department of Homeland Security ("DHS") had actual notice of Mata Franco's unlawful presence in the United States, the information is time-barred under 18 U.S.C. § 3262(a). For the reasons set forth below, the Court agrees with Mata Franco and grants his motion to dismiss the information [15].

**I.       Background**

Mata Franco was born in Mexico on November 18, 1973. He came to the United States in early 1974, and became a lawful permanent resident in February 1989, at the age of 16. Mata Franco was convicted of a crime and removed to Mexico on May 4, 2001, with a permanent bar to re-entry to the United States. He returned to the United States without permission. On September 19, 2003, Mata Franco was convicted of another crime and sentenced to a term of ten years' incarceration in state prison. Shortly thereafter, on December 8, 2003, the Law Enforcement Support Center ("LESC"), a unit of ICE that provides other law enforcement agencies with immigration and identity information on suspected criminal aliens, prepared a

report, entitled "Worksheet for Oral Report," which was placed in Mata Franco's immigration file (also known as an "A-File"). The report provided Mata Franco's name, birth date, nationality, alien registration number, FBI number, and Illinois identifying number. In addition, the report stated that Mata-Franco was residing at that time at Robinson Correctional Center, and provides his expected release date. The report described Mata Franco as "IN-CUSTODY / PRIOR DEPORT / AGGRAVATED FELON." [15, Ex. A.] The Work Sheet, along with the rest of Mata Franco's A-File, was forwarded from an ICE unit in Williston, Vermont, to the Chicago Field Office of ICE on December 9, 2003, and was received by the Chicago Field Office two days later.

As the Government advised, when an alien subject to removal is held in custody by a federal, state, or local law enforcement agency, an ICE field office generally will issue a detainer pursuant to 8 C.F.R. § 287.7(a) to advise other law enforcement agencies that DHS seeks custody of that individual in order to arrest and remove him. The detainer serves as "a request that such agency advise [DHS], prior to the release of the alien, in order for [DHS] to arrange to assume custody, in situations when gaining immediate physical custody is either impracticable or impossible." 8 C.F.R. § 287.7(a). In Mata Franco's case, it is unclear from the ICE / DHS documents in his A-file whether ICE ever issued a detainer to state law enforcement authorities, despite ICE's awareness (as evidenced by the December 8, 2003 Work Sheet) that Mata Franco was in state custody and despite the Chicago Field Office's receipt of Mata Franco's A-file.[1] The Government's surmise that no detainer was issued is consistent with the course of events following the completion of Mata Franco's state sentence on November 22, 2006. He was

---

[1] The Government acknowledges a discrepancy in the documents in Mata Franco's A-file. The December 8, 2003 Work Sheet stated that "Subject reportedly has no detainer at this time." However, the "IN CUSTODY" cover sheet created by the LESC noted that Mata Franco "reportedly does have a detainer placed on [him]." On the basis of its review of the DHS records in the case, the Government concludes that a detainer was not issued. [27, at 4-5.]

released from state custody and placed on parole, from which he was discharged on April 17, 2008. In early December 2010, ICE received a telephone tip about Mata Franco's whereabouts. On December 9, 2010, ICE agents arrested Mata Franco and placed him in administrative detention. Mata Franco tendered to the Government and to the Court (in camera) certain documents, including tax records and pay stubs, indicating that he was not concealing his presence in this country during the time between his release from state custody in 2006 and his arrest by ICE agents in 2010. The Government filed an information charging Mata Franco with illegal reentry under 8 U.S.C. § 1326(a)(2) on January 28, 2011.

## II.    Legal Standard

Federal Rule of Criminal Procedure 7(c)(1) sets forth the substantive requirements of an indictment or information. FED. R. CRIM. P. 7(c)(1). The Seventh Circuit teaches that an information complies with Rule 7(c)(1) where it (1) states the elements of the offense charged, (2) fairly informs the defendant of the nature of the charge so that he may prepare a defense, and (3) enables him to plead an acquittal or conviction as a bar against future prosecutions for the same offense. *United States v. Black*, 125 F.3d 454, 465 (7th Cir. 1997).

A party seeking to challenge the sufficiency of an indictment or information under Rule 7(c) may do so by way of a pretrial motion pursuant to Rule 12(b)(3)(B). FED. R. CRIM. P. 12(b)(3)(B). Courts are to review the sufficiency of an information "by looking at the language it employs, separate and apart from the facts proved at trial." *Black*, 125 F.3d at 465. Courts should take care not to "blur[]" considerations regarding the sufficiency of an information with those regarding sufficiency of the evidence. *Id*; see also *United States v. Moore*, 563 F.3d 583, 586 (7th Cir. 2009) (stating that a Rule 12(b)(3)(B) motion to dismiss an indictment is not "a means of testing the strength or weakness of the government's case" (internal quotation marks

and citations omitted)). Thus, while an indictment or information may be dismissed if it is subject to a defense that raises a purely legal question (see *United States v. Labs of Virginia, Inc.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003)), a defense that relates to the strength of the Government's evidence ordinarily must wait for the trial. *Moore*, 563 F.3d at 586 (stating that at the motion to dismiss phase a court is to determine "whether it's possible to view the conduct alleged" as constituting the crime charged); *United States v. Risk*, 843 F.2d 1059, 1061 (7th Cir. 1988) (affirming the district court's dismissal of an indictment "not because the government could not prove its case, but because there was no case to prove").

III. **Analysis**

The offense of illegal reentry is committed when a person who was previously removed either "(1) enters the United States; (2) attempts to enter the United States; or (3) is *at any time found in* the United States" without the permission of the Attorney General. *United States v. Gordon*, 513 F.3d 659, 663 (7th Cir. 2007) (citing *United States v. Herrera-Ordones*, 190 F.3d 504, 509 (7th Cir. 1999)) (emphasis added), abrogated on other grounds by *United States v. Bartlett*, 567 F.3d 901 (7th Cir. 2009); see also 8 U.S.C. § 1326(a)(2). The third, "found in" type of violation – the one at issue in this case – is committed when an alien "enters via a surreptitious border crossing or 'enters through a recognized port by means of specious documentation that conceals the illegality of his presence.'" *Gordon*, 513 F.3d at 663 (quoting *United States v. Acevedo*, 229 F.3d 350, 355 (2d Cir. 2000)).

The general five-year limitations period for non-capital offenses under 18 U.S.C. § 3282(a) applies to § 1326(a)(2) offenses. See *United States v. Are*, 498 F.3d 460, 461 (7th Cir. 2007) (applying the five-year limitations period set forth in § 3282(a)(2) in an illegal reentry case). Accordingly, an information (or indictment) that charges a § 1326(a)(2) offense must be

filed within five years of the date on which the illegal reentry offense is "complete."  See *Toussie v. United States*, 397 U.S. 112, 115 (1970).  This case presents the following question:  when a previously deported alien surreptitiously reenters the United States, does the Government's actual notice of his identity, presence, and status as a previously deported alien start the five-year clock running for purposes of the so-called "found in" version of illegal reentry under § 1326(a)(2)?  Although Seventh Circuit precedent provides a good deal of analytical guidance on that question, there does not appear to be any controlling decision directly on point.  In fact, on two occasions the court of appeals has reserved ruling on the question because in both instances it was able to dispose of the statute of limitations issue on other grounds.  See *Gordon*, 513 F.3d at 665; *Are*, 498 F.3d at 466-67.

## A.      Illegal Reentry Is a Continuing Offense

As an initial matter, Mata Franco calls into question whether the Seventh Circuit definitively has ruled that illegal reentry is a continuing offense.  The Court therefore reviews the relevant authority on continuing offenses in general and on illegal reentry as a continuing offense in particular before turning to a discussion of when illegal reentry may be deemed complete for statute of limitations purposes.

The Supreme Court has held that "criminal limitations statutes are to be liberally interpreted in favor of repose."  *Toussie*, 397 U.S. at 115 (internal quotation marks and citations omitted).  That principle comports with the purpose of a limitations statute, which "is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions."  *Id.* at 114.  The principle exists in tension with the doctrine of continuing offenses, as "the latter, for all practical purposes, extends the statute [of limitations] beyond its stated term."  *Id.* at 115.  Accordingly, the Supreme

Court in *Toussie* held that "a particular offense should never be construed as a continuing one * * * unless the explicit language of the substantive criminal statute compels such a conclusion, or the nature of the crime involved is such that Congress must assuredly have intended that it be treated as a continuing one." *Id.*

In *Toussie*, the Court considered whether failure to register for the draft was a continuing offense. *Toussie*, 397 U.S. at 112-13. The Government argued that a defendant accused of failing to register continued to commit that offense each day that he did not register. *Id.* at 114. Although the Court acknowledged that the regulation requiring registration "does in explicit terms refer to registration as a continuing duty," it held that it "cannot give it the effect of making this criminal offense a continuing one" in view of the principle of repose coupled with the fact that "there is no language in this Act that *clearly* contemplates a prolonged course of conduct." *Id.* at 120-21 (emphasis added). The Supreme Court therefore held that the statute of limitations for the offense in question began to run upon a defendant's *initial* failure to register in accordance with the statute. *Id.* at 123. The Court noted that its holding was unlikely to hinder the statute's purpose, as it "fe[lt] that the threat of criminal punishment and the five-year statute of limitations is a sufficient incentive to encourage compliance with the registration requirements. If Congress had felt otherwise it could easily have provided for a longer period of limitations." *Id.*

Working under the rubric of *Toussie*'s rigorous standard for continuing offenses, the circuits have split on the issue of whether illegal reentry constitutes a continuing offense. Compare *United States v. DiSantillo*, 615 F.2d 128, 137 (3d Cir. 1980), with *United States v. Estrada-Quijas*, 183 F.3d 758, 761-62 (8th Cir. 1999); *United States v. Santana-Castellano*, 74 F.3d 593, 598 (5th Cir. 1996); *United States v. Rivera-Ventura*, 72 F.3d 277, 281-82 (2d Cir.

1995); see also *United States v. Lennon*, 372 F.3d 535, 541 n.8 (3d Cir. 2004) (citing cases). At least one court has ruled that illegal reentry is not a continuing offense. See *DiSantillo*, 615 F.2d at 137 (concluding that illegal reentry is not a continuing offense and stating that when an alien's "entry was surreptitious and not through an official port of entry, the alien is 'found' when his presence is first noted by the immigration authorities"). However, other circuits have held explicitly that illegal reentry is a continuing offense. See *Estrada-Quijas*, 183 F.3d at 761-62 (ruling that "the offense of illegal reentry is an on-going offense that ends only when an offender is discovered"); *Santana-Castellano*, 74 F.3d at 598 (holding that the "found in" offense is a continuing one that is complete when a previously deported alien's "physical presence is discovered and noted by the immigration authorities, and the knowledge of the illegality of his presence, through the exercise of diligence typical of law enforcement authorities, can reasonably be attributed to the immigration authorities"); *Rivera-Ventura*, 72 F.3d at 281-82 (holding that "found in" version of illegal reentry is not a continuing offense past the occurrence of discovery, and adopting a constructive discovery rule); see also *Lennon*, 372 F.3d 535, 541 n.8 (3d Cir. 2004) (holding that while the Third Circuit in *DiSantillo* held, on the facts of that case, that the "found in" offense was not a continuing crime, "[s]ince that time, numerous other courts have taken positions that are, to varying degrees, to the contrary" and suggesting that "[p]erhaps this should cause a re-examination of our holding in *DiSantillo*" (citing cases)).

The Seventh Circuit has adopted what appears to be the majority view that illegal reentry *is* a continuing offense. See *Are*, 498 F.3d at 466. In *Are*, the Seventh Circuit stated that "because *the 'found in' version of § 1326(a)(2) is a continuing offense*, the date on which the immigration agency 'should have discovered' the alien is simply irrelevant." *Id.* (emphasis added). Mata Franco urges the Court to consider this language as *dicta* only. However, the

Court believes this language to be binding.  The *Are* court's conclusion on the continuing offense question is unambiguous; it also was pivotal to the court's ultimate ruling that constructive notice of unlawful presence is not enough to render the crime complete.  See *id.*  The court arrived at that conclusion upon careful review and discussion of other circuits' rulings on the issue (see *id.* at 466 n.2), and, as described above, its conclusion is consistent with the majority view.

In any event, if the question remained open in this circuit, this Court would follow the majority rule in view of the nature of the "found in" offense.  In contrast to the acts of "entry" or "attempted entry" in § 1326(a)(2) – which, by virtue of the fact that they take place at official points of entry, automatically clue the Government in to the fact that a crime is being committed – the act of *surreptitious* entry prevents the Government from knowing that an illegal reentry has occurred.  See *United States v. Herrera-Ordones*, 190 F.3d 504, 510 (7th Cir. 1999) (holding that when a previously removed alien enters surreptitiously, "he is not identifiable, and hence not 'found'"); see also *United States v. Gomez*, 38 F.3d 1031, 1034-35 (8th Cir. 1994).  Put simply, the "nature of the [found in] crime involved is such that Congress must have intended that it be treated as a continuous one."  *Toussie*, 397 U.S. at 115.  In other words, by including the "found in" alternative, Congress sought to capture within the ambit of the criminal statute that population of offenders who were engaged in "a prolonged course of conduct" stemming from their initial surreptitious entry.  See *id.* at 120-21.  Finally, contrary to Mata Franco's implicit complaint with the language in *Are*, deeming illegal reentry a continuing offense does not preclude the possibility that immigration officials' actual notice of a previously deported alien's unlawful presence suffices to complete the crime.  Indeed, as discussed below, the Seventh Circuit in *Are* and subsequent cases has left live the possibility that actual notice completes the offense for statute of limitations purposes, and other circuits have so ruled expressly.  See *Are*,

498 F.3d at 466-67; *Gordon*, 513 F.3d at 665; see also, *e.g.*, *Gomez*, 38 F.3d at 1035.  The Court

next turns to address that issue in view of the specific facts of this case.

  **B.**  **Does Actual Notice Complete the Offense of Illegal Reentry?**

  In general, statutes of limitation begin to run when the crime is complete.  See *Toussie*,

397 U.S. at 115.  The § 1326(a)(2) "found in" offense is *first* committed at the time that a

previously removed alien surreptitiously enters the United States without permission.  See

*Gordon*, 513 F.3d at 663 (citing *United States v. Acevedo*, 229 F.3d 350, 355 (2d Cir. 2000));

*United States v. Lopez-Flores*, 275 F.3d 661, 663 (7th Cir. 2001) (holding that "[a]ll the courts to

address the question have held that at least in the case of surreptitious reentry, as in this case, the

'found in' offense is first committed at the time of the reentry and continues to the time when the

defendant is arrested for the offense" (citing cases)).  When the "found in" offense is *complete*,

however, is a subject of disagreement among those courts that have addressed the issue.  See J.

Gabriel Carpenter, United States v. Are:  *Deciding Whether Actual or Constructive Knowledge*

*Starts the Statute of Limitations for Deported Aliens 'Found In' the United States*, 31 AM. J.

TRIAL ADVOC. 681, 681 (2008) (reviewing cases and determining that although courts have

agreed that the limitations clock starts to run when the previously deported alien is "found in" the

United States, they have differed as to the meaning of "found in").  Some courts have held that

the offense is complete when immigration authorities reasonably should have discovered the

offender's unlawful presence.  See, *e.g.*, *Rivera-Ventura*, 72 F.3d at 281-82.  However, the

Seventh Circuit clearly has held that constructive notice does not suffice to terminate the

offending conduct for statute of limitations purposes.  See *Are*, 498 F.3d at 466; *Gordon*, 513

F.3d at 664 (declining to reconsider or overturn *Are*'s rejection of a constructive knowledge

standard and explaining that concerns about "provid[ing] an incentive to illegal aliens to subtly

fly under the government's radar" provide "a compelling reason not to join our sister circuits on [constructive notice] issue").

In *Are*, the defendant was convicted and sentenced on a drug charge in early 1995. *Are*, 431 F. Supp. 2d 842, 842 (N.D. Ill. 2006), *rev'd*, 498 F.3d 460 (7th Cir. 2007). He was ordered removed to his home country of Nigeria in 1996, upon completion of his sentence. *Id.* The defendant was caught attempting to enter the United States on May 9, 1998, and was detained. *Id.* at 842-43. The probation office for the Eastern District of New York prepared a "Violation of Supervised Release Report," and an arrest warrant identifying defendant's name and last known address was issued. *Id.* at 843. The defendant was removed one day later, on May 10, 1998. On September 4, 1998, the defendant attempted to reenter the country at a port of entry and was turned back. A few days later, he succeeded in reentering the country surreptitiously and resumed living at the Chicago address identified in the arrest warrant. *Id.* One year *prior* to his return (while defendant presumably was still out of the country), the Immigration and Naturalization Service ("INS") received an anonymous tip that the defendant was residing with his wife in Chicago. *Id.* In October 1998, the INS opened an investigation into the defendant. *Id.* INS prepared a document entitled "Investigation Preliminary Worksheet" that identified the defendant's name, file number, status, and last known address in Chicago, and stated that his case was "in progress." *Id.* In a section entitled "additional information required," the document stated "Prior Deport" and "Reinstatement Case." *Id.* In February 2001, the defendant and his family moved from the address identified in the arrest report to another location in a suburb of Chicago. *Id.* The defendant was arrested on September 23, 2003. *Id.* He posted bond after providing a false name, but the Government discovered his actual identity and the outstanding 1998 arrest warrant after his fingerprints were processed. *Id.* The Government filed another

arrest warrant and a complaint regarding the defendant's unlawful presence, and a grand jury returned an indictment on charges of illegal reentry on August 10, 2005. *Id.*

The parties in *Are* agreed that the 1998 INS Worksheet was not evidence that immigration authorities had actual notice of the defendant's unlawful presence. *Are*, 498 F.3d at 463. Indeed, the parties agreed that the Government did not have actual notice until late 2003 or early 2004. *Id.* The defendant nevertheless argued that because the INS Worksheet provided *constructive* notice of his presence, he was "found in" the United States for purposes of § 1326(a)(2) in October 1998. *Are*, 431 F. Supp. 2d at 844. The defendant contended that, as of that date, "the government had *access to* his address and prior immigration status and even if it did not know that he had illegally reentered the country, it could have ascertained that information through a reasonably diligent investigation." *Id.* (emphasis added).

As the district court found, the INS Worksheet "merely commemorate[d] the initiation of a case" against the defendant, and was not evidence that immigration authorities knew of his presence. *Id.* The district court thus concluded that the document did not show that the Government had *actual notice* of the defendant. *Id.* However, the district court held that the Government could have, through exercise of reasonable diligence, discovered the defendant's address (and thus presence) through a chain of documents (including the INS worksheet, a 1998 probation violation report, the 1998 arrest warrant, and 1994 presentence reports) more than five years prior to the date on which the indictment was returned. *Id.* The district court therefore dismissed the indictment as time-barred. *Id.*

On appeal, the Seventh Circuit was presented with the question of whether constructive notice is enough to trigger the statute of limitations running for a "found in" offense. *Are*, 498 F.3d at 462. The court answered in the negative, and reversed the district court's decision. *Id.* at

466-67. The court held that because the "found in" offense is a continuing offense, a previously removed alien's illegal presence is prolonged "each day he goes undetected." *Id.* at 466 (citing *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006)). The court in *Are* suggested that the day that the removed person *actually* stops going undetected – in other words, *either* the day that his presence is actually discovered by immigration officials at the earliest, or, at the latest, the day that he turns himself in – renders the continuing offense complete for statute of limitations purposes. *Id.* at 466-67.

*Are* left undisturbed the rule, previously stated by the Seventh Circuit in *Herrera-Ordones*, regarding what constitutes being "found" under § 1326(a)(2). *Are*, 498 F.3d at 465, 467. The court in *Herrera-Ordones* held that there are two components of being "found" under § 1326: "First, the INS [now, ICE] discovers the physical presence of the deported alien, and second, it ascertains the alien's identity (as an illegal alien) and status (as one who has reentered after previous deportation)." *Herrera-Ordones*, 190 F.3d at 510. Because in *Are* the immigration authorities did not learn of Are's presence in Chicago or ascertain his identity and status as a previously removed alien until sometime in late 2003 or 2004, and did not arrest him until 2005, the Seventh Circuit held that he was not "found" until one of those two dates. *Are*, 498 F.3d at 467. And, because applying either date placed the defendant's indictment within the five-year limitations window, the court declined to address *which* of those two dates triggered the clock. *Id.*

In *Gordon*, the Seventh Circuit reaffirmed the rules set forth in *Are* that (1) illegal reentry is a continuing offense and (2) constructive notice does not suffice to begin the running of the limitations period. *Gordon*, 513 F.3d at 664. The court voiced concern that holding otherwise would incentivize unlawfully present aliens to "subtly fly under the government's radar" by

permitting "an alien [to] hide[] well for five years after giving the government *a mere sniff* of his presence." *Id*. In *Gordon*, the Government's official discovery of the defendant *and* the date of defendant's arrest date were one and the same. *Id*. Because "[u]nder the standard set forth in *Are*, the only possible date from which the statute of limitations could begin to run [was] * * * the date of the federal government's actual discovery of Gordon's illegal presence * * *[,] Gordon's * * * indictment was timely * * *." *Id*. at 665. As in *Are*, the court held that it "again need not assign a single operative date [on which the statute of limitations clock began to run]." *Id*. Thus, the court again left unresolved the question of whether the actual discovery date starts the limitations clock. *Id*.[2]

Here, there is no dispute that Mata Franco entered the United States surreptitiously sometime between 2001 and 2003. Furthermore, the parties agree that ICE created and filed a document (the Work Sheet) on December 8, 2003, that (1) identified Mata Franco's status as a previously removed alien and (2) noted his presence in the United States as a state prisoner. The face of the December 8, 2003, ICE Work Sheets provides Mata Franco's name, date of birth, nationality (Mexican), alien registration number, FBI number, state prisoner number, immigration status as a previously removed alien and aggravated felon, and location (as of the date of the Work Sheet) in a state correctional center. The Work Sheet also identifies Mata Franco's expected date of release from state prison (May 5, 2007) and notes that immigration authorities had not yet issued a detainer to ensure his transfer to federal immigration custody upon completion of his state sentence. According to the Government, the Work Sheet, along

---

[2] In both *Gordon* and *Are*, the Government took the position that the statute of limitations began to run when it had actual notice of the defendant's illegal presence in the United States. See *Gordon*, 513 F.3d at 661 (stating that "because his reentry was surreptitious, the government argued, the statute of limitations did not begin to run until the government 'actually discovered' Gordon's illegal presence in the United States"); *Are*, 498 F.3d at 467 (noting that "[t]he government argues, however, for the earlier date of 'actual discovery,' that is, the date when immigration authorities acquire actual knowledge of the alien's physical presence, identity, and status as a prior deportee").

with the rest of Mata Franco's A-file, was sent to the Chicago Field Office on December 11, 2003. The Government has acknowledged that its records indicate that – consistent with the indication in the cover sheet in Mata Franco's A-File, but contrary to the statement on the ICE Work Sheet in that file – immigration officials never issued a detainer to ensure that Mata Franco would be transferred to ICE custody once his term of state incarceration was complete.

Mata Franco argues that the ICE Work Sheet constitutes evidence that, at least as early as December 8, 2003, immigration authorities had actual notice of Mata Franco's identity, presence (in state custody), and immigration status as a previously deported alien. Mata Franco states that this information is enough to complete the "found in" violation under § 1326(a)(2). See *Are*, 431 F. Supp. 2d at 844; *Herrera-Ordones*, 190 F.3d at 510. Accordingly, he argues that his offense was complete as of the date of the ICE Work Sheet. Because that date was more than five years before the Government filed the information charging him with illegal reentry in 2010, Mata Franco contends that the information is time-barred and must be dismissed. In other words, Mata Franco urges the Court to adopt the earlier of the two possible events – actual notice or arrest – that the Seventh Circuit in *Are* and *Gordon* suggested would trigger the statute of limitations. See *Gordon*, 513 F.3d at 665; *Are*, 498 F.3d at 466-67.

The Government does not dispute that the Work Sheet sets forth facts sufficient to impute actual notice to immigration authorities as of December 8, 2003. In other words, the Government concedes that, unlike the INS Work Sheet at issue in *Are*, which merely provided the defendant's last known residential address for purposes of opening an investigation, the ICE Work Sheet prepared for Mata Franco is evidence that immigration officials had actual notice that Mata Franco was present in the United States and detained in state custody despite previously having been deported. See *Are*, 431 F. Supp. 2d at 843. However, the Government

argues that it is not the date of actual notice but the date of arrest that should constitute being "found" and trigger the statute of limitations. Mata Franco was arrested on December 9, 2010. Thus, under the Government's interpretation, the statute of limitations did not begin to run until December 9, 2010, and stopped running fifty days later, on January 28, 2011, when the information charging him with illegal reentry was filed. As this lag was well within the five-year limitations period, the Government contends that the information is not time-barred.

In contrast to *Are* and *Gordon*, the salient facts presented in this case require the Court to choose "a single operative date" (*Gordon*, 573, F.3d at 665) on which the statute of limitations began to run for purposes of charging Mata Franco with an unlawful reentry offense. Absent a controlling decision from the Seventh Circuit, the Court looks to the plain language of § 1326(a)(2), the Seventh Circuit's interpretation of that language, the interplay of § 1326(a)(2) and the applicable statute of limitations under § 3282(a), and the overriding public policy concerns at issue in criminal limitations period cases, as expressed by the Supreme Court in *Toussie* as well as the Seventh Circuit in *Gordon*, in order to determine whether the actual notice that the Government may be presumed to have had on December 8, 2003, is enough to complete the "found in" violation and thus trigger the running of the limitations period.

A court "must first look to the plain language of a statute when interpreting its meaning." *Central States, Southeast and Southwest Areas Pension Fund v. Robinson*, 55 F.3d 1318, 1322 (7th Cir. 1995). Where a statute provides no special definition of a word, courts must assume that the word has its usual meaning. *United States v. Kirschenbaum*, 156 F.3d 784, 795 (7th Cir. 1998) (citing *Lorillard v. Pons*, 434 U.S. 575, 583 (1978)). The key language in the statute under which Mata Franco is charged is "found in at any time." See 8 U.S.C. § 1326(a)(2). A commonly used dictionary defines "find" (of which "found" is a past participle) as "to get sight

or knowledge of; perceive; learn." WEBSTER'S NEW WORLD COLLEGE DICTIONARY 530, 558 (4th ed. 2007); see also *cf.* Adam Liptak, *Justices Turning More Frequently to Dictionary, and Not Just for Big Words*, N.Y. TIMES, Jun. 13, 2011, at A11.

The Seventh Circuit's interpretation of the term "found in" is consistent with the plain, dictionary definition of the term. The court has indicated that "'found in' must have the force of 'present in' rather than 'discovered by the INS to be in'" at least for purposes of *culpability*, because "[i]t would be passing odd to say that [a defendant] had violated the statute when he entered but then was free of further criminal culpability until he was discovered by the INS." *United States v. Lopez-Flores*, 275 F.3d 661, 663 (7th Cir. 2001). In order words, discovery of the alien cannot be considered an element of the alien's commission of the offense of illegal reentry. See *Are*, 498 F.3d at 464 (expounding upon the holding in *Lopez-Flores*). The Seventh Circuit similarly has explained that at least "for purposes of liability and venue, the 'found in' crime does not occur 'only at the instant of detection.'" *Id.* (quoting *United States v. Rodriguez-Rodriguez*, 453 F.3d 458, 460 (7th Cir. 2006)). At the same time, however, the Seventh Circuit held in *Lopez-Flores* and reiterated in *Are* that although "[t]he *date of discovery* has no significance as far as culpability is concerned," (*id.* at 464) "it *may bear on the running of the statute of limitations*" (*id.* at 466) (emphasis added) (quoting *Lopez-Flores*, 275 F.3d at 663).

In *Are*, the Seventh Circuit considered the term "found in" in the statute of limitations context. *Are*, 498 F.3d at 464. Citing *Lopez-Flores*, the court in *Are* reiterated that being "found" must mean more than that the Government *should have discovered* a person. *Id.* at 466 (holding that "because the 'found in' version of § 1326(a)(2) is a continuing offense, the date on which the immigration agency 'should have discovered' the alien is simply irrelevant") (citing *Lopez-Flores*, 275 F.3d at 663). Although the court qualified its earlier ruling in *Herrera-*

*Ordones* (a venue case) with respect to the question of whether constructive notice was enough to start the limitations clock, it recited with approval the definition of "found in" set forth in *Herrera-Ordones*: "found in" means apprehension of one's identity, immigration status, and physical whereabouts. *Are*, 498 F.3d at 465, 467 (citing *Herrera-Ordones*, 190 F.3d at 510); see also *Rodriguez-Rodriguez*, 453 F.3d at 461 (explaining that *Herrera-Ordones* establishes that, when an alien frustrates earlier discovery of his identity and status, he is 'found' and may be prosecuted when federal agents at last stumble upon him in state prison"). *Are* thus suggests that although simply having information at one's disposal that *enables* one to learn of an alien's identity, presence, and immigration status may not be enough to constitute "finding" that person (as was the case in *Are* itself), *actually* learning of the alien's identity, location, and status, collectively, is enough to constitute "finding." In other words, for statute of limitations purposes, *Are* suggests that obtaining actual notice – that is, actually knowing, perceiving, or learning – that an alien has committed the elements of the crime triggers the running of the limitations clock.

Even accepting that "found in" may be distinct from "present in" in the statute of limitations context, the Government contends that the statutory language "found in *at any time*" means that Congress intended the offense to be completed (and the statute of limitations triggered) *each* time that the Government "finds" the alien. (6/17/2011 Tr. at 15.) Under the Government's interpretation, immigration authorities might learn of a previously deported alien's identity, location, and immigration status – and so have actual notice of his offense of illegal reentry – on a number of occasions over time, and each time that they garner such information the statute of limitations would start anew. Thus, from the Government's perspective, even if actual notice started the limitations clock as early as December 8, 2003 – the

17

date of the ICE Work Sheet that the Government concedes provides actual notice of Mata Franco's presence – when the Government "refound" Mata Franco on the date of his arrest almost exactly seven years later, the limitations clock started again.

Arguably, looking at § 1326(a)(2) alone, the Government's interpretation of the phrase "found in at any time" is not unreasonable. However, the Government does not square its interpretation with the statute of limitations under 18 U.S.C. § 3282(a) that the Seventh Circuit has applied to illegal reentry offense. See *Are*, 498 F.3d at 461. As noted above, the very "purpose of a statute of limitations is to limit exposure to criminal prosecution to a certain fixed period of time following the occurrence of those acts the legislature has decided to punish by criminal sanctions." *Toussie*, 397 U.S. at 114. To hold that the limitations period is stopped and triggered anew each time that immigration officials obtain actual notice of an alien's unlawful presence would so undermine the purpose underlying the criminal limitations statute as to effectively eliminate it altogether for this particular offense.

The Court must attempt to read both the illegal reentry statute and the statute of limitations together and reconcile them if it is possible to do so. See *Muscarello v. United States*, 524 U.S. 125, 147 (1998) (holding that "courts normally try to read language in different, but related statutes, so as best to reconcile those statutes, in light of their purposes and of common sense") (quoting *United States v. McFadden*, 13 F.3d 463, 467 (1st Cir. 1994)). Mata Franco's interpretation of the phrase "at any time" does the least violence to *both* statutes. Mata Franco interprets the phrase "at any time" to mean that the statute of limitations is *tolled* for the entirety of the time between when a previously deported alien surreptitiously enters the United States and when he is found. Such an interpretation comports with the plain language of § 1326(a) without rendering meaningless the applicable limitations statute under § 3282(a). Moreover, for the

reasons noted above, it is consistent with the way in which the Seventh Circuit has interpreted "found in" in both the culpability and statute of limitations contexts. See, *e.g.*, *Are*, 498 F.3d at 466 (explaining that under "the straightforward text and obvious purpose of the statute," a previously deported alien who has reentered surreptitiously prolongs his unlawful presence "each day he goes *undetected*" and that "[t]he limitation clock does not run *during this period*" because the alien's offense during this period is continuing (emphasis added)). Other circuits similarly have found the offense to be complete – and the statute of limitations thereby triggered – at the moment that the unlawful reentrant's conduct ceases to be "surreptitious" because he has been "discovered" by immigration authorities. See *United States v. Gomez*, 38 F.3d 1031, 1034-35 (8th Cir. 1994) (contrasting the offenses of entry and attempted entry – "which are complete when the deported alien enters or attempts to enter through a recognized INS port of entry" and for which "the statute of limitations begins to run as soon as the (attempted) entry is effected" – with the "found in" offense – for which "there is no such entry to trigger the statute to run" because the alien came into the United States surreptitiously, and so is "not complete until the alien is 'discovered' by immigration authorities").

Mata Franco's interpretation also makes the most sense from a public policy standpoint. The Seventh Circuit has rejected a constructive notice standard in illegal reentry cases in part because it did not want to "provide an incentive to illegal aliens to subtly fly under the government's radar."[3] Gordon, 513 F.3d at 664. By the same token, as the Supreme Court observed in *Toussie*, criminal statutes of limitation "have the salutary effect of encouraging law

---

[3] The Supreme Court recognized in *Toussie* that there is inevitably some risk that individuals will escape prosecution by virtue of criminal limitations statutes. *Toussie*, 297 U.S. at 123-24 ("every statute of limitations, of course, may permit a rogue to escape" (citing *Pendergast v. United States*, 317 U.S. 412, 418 (1943)). But in the event that an unlawful alien purposely conceals his whereabouts in order to wait out the statute of limitations, the clock is tolled and the person continues to be subject to criminal prosecution. See *United States v. Rivera-Ventura*, 72 F.3d 277, 281-82 (2d Cir. 1995).

enforcement officials promptly to investigate suspected criminal activity." *Toussie*, 397 U.S. at 115. Here, the Government became aware of Mata Franco's offense at least as early as December 3, 2003 – the date on which he was identified as a previously deported alien present in a fixed and easily identifiable location within the United States. Equipped with that information, the Government nonetheless failed to file an information against him until seven years had passed.[4] By the time they did so, the statute of limitations had run. Accordingly, the information against Mata Franco must be dismissed.

---

[4] There is no evidence that Mata Franco made any effort to conceal his whereabouts during that time. For some of this period, he was in state custody or on parole. For the remainder, it appears that he had a steady job, and both his paystubs and tax returns reflect the use of a single address in Chicago.

**IV.     Conclusion**

For the reasons set forth above, the Court concludes that the Government had actual notice of Mata Franco's unlawful presence in the United States and custody in state prison as of December 8, 2003.  On that date, the offense of unlawful reentry under the "found in" clause of § 1326(a)(2) was complete, and the five-year statute of limitations under § 3282(a) began to run. The Government did not file an information charging Mata Franco with illegal reentry until seven years later, on December 9, 2010.  The information is therefore time-barred, and must be dismissed as a matter of law under Federal Rule of Criminal Procedure 12(b)(3)(B).  See *United States v. Labs of Virginia, Inc.*, 272 F. Supp. 2d 764, 768 (N.D. Ill. 2003)).  The Court therefore grants Mata Franco's motion to dismiss the information [15].[5]

Dated: July 13, 2011

_____
Robert M. Dow, Jr.
United States District Judge

---

[5]  As Mata Franco has noted in his recent filings, regardless of the disposition of this motion, he faces deportation with a permanent bar to reentry.